IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

STORMI LYNN ADAMS                                                                          PLAINTIFF

        v.                            Civil No. 2:15-cv-02106-PKH-MEF

CAROLYN W. COLVIN, Commissioner
Social Security Administration                                                        DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff, Stormi Adams, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382. In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.**      **Procedural Background:**

      Plaintiff filed her application for SSI on August 12, 2010, due to depression, knee and shoulder pain, and headaches. (Tr. 140, 153-155, 173, 180) The Commissioner denied her application initially and on reconsideration. At the Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on December 13, 2011. (Tr. 31-58) The ALJ entered an unfavorable decision on January 18, 2012. (Tr. 14-26, 369-381) On November 18, 2013, the United States District Court for the Western District of Arkansas reversed and remanded the ALJ's decision for further consideration of the treating source statement from Dr. Kelli Rippy. (Tr. 398-404, 405-406) The District Court also directed the ALJ to obtain the x-ray results referenced by Dr. Rippy, but not included in the record. The ALJ held a supplemental hearing on October 21, 2014. (Tr. 333-361) Plaintiff was present and represented by counsel.

At the time of the hearing, Plaintiff was 50 years old and possessed a high school education and some college credit. (Tr. 336, 339) She had past relevant work ("PRW") experience as a clerk and cashier. (Tr. 141, 145-150)

On March 26, 2015, the ALJ concluded that the Plaintiff's musculoskeletal and mental disorders were severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 317-320) He concluded the Plaintiff could perform light work with occasional overhead reaching bilaterally, climbing, balancing, crawling, kneeling, crouching, feeling, fingering, and handling bilaterally. (Tr. 320) Further, the ALJ found she could perform work consisting of simple, routine, and repetitive tasks in a setting where the interpersonal contact is incidental to the work performed; the supervision is simple, direct, and concrete; and, the work does not require the Plaintiff to work around the general public. With the assistance of a vocational expert, the ALJ determined Plaintiff could perform work as a molding operator, molding machine tenderer, vacuum plastic forming operator, power screw driving operator, and filling and closing machine operator.

Subsequently, Plaintiff filed this action. (ECF No. 1) This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 13, 15)

**II.     Applicable Law:**

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,*

761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

　　A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(3)(c). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

　　The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of

her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920(a)(4)(v).

### III.    Medical Evidence:

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and are repeated here only to the extent necessary.

At the onset, the undersigned notes that the Plaintiff alleged an onset date of August 3, 2010. (Tr. 114, 315) Plaintiff, however, sought out no treatment, mental or physical, between her alleged onset date and January 2011.

#### A.    Physical Impairments:

The Plaintiff carries the following physical diagnoses: chronic hepatitis C for which she does not wish treatment, ankle joint and knee pain, cervicalgia, and lumbago. In November 2010, Dr. Michael Westbrook performed a consultative exam ("CE") at the Commissioner's request. (Tr. 216-224) An examination revealed a normal range of motion in all extremities, no atrophy, no deformities, and a steady gait/coordination. Dr. Westbrook diagnosed uncomplicated depression with a history of learning disorder and specifically assessed no limitations.

On November 3, 2010, non-examining consultant, Jonathan Myers reviewed the record and completed an RFC assessment finding no severe physical impairment. (Tr. 199-200)

On June 20, 2011, Plaintiff presented with complaints of bilateral knee pain, alleging a lifelong history of knee problems with a recent exacerbation of symptoms. (Tr. 273-274) Records indicate that the knee was injured when she fell "in a rut." The date of injury is not clear, but it is apparent that the injury occurred prior to the Plaintiff's application for benefits. She also

complained of headaches and tingling and numbness in her neck. Moreover, Plaintiff reported a history of hepatitis C for which she had not undergone treatment. Dr. Rippy noted mild tension and tenderness in the cervical paraspinous muscles, a normal gait and stance, and full strength and range of motion in all extremities. She diagnosed chronic hepatitis C, depression, anxiety, ankle joint pain, cervicalgia, knee joint pain, and recovering alcohol/drug dependence. Dr. Rippy prescribed Prednisone, Flexeril, and Mobic. Although she ordered a full hepatitis workup, Plaintiff did not want to pursue it.

On September 29, 2011, Plaintiff returned with continued complaints of left knee and right ankle pain. (Tr. 278-279) She contended that her left knee was much worse, reporting stiffness, constant pain, and popping. Plaintiff also complained of heel pain when she stood after sitting for prolonged periods. Further, she admitted that the Mobic and steroids previously prescribed had been helpful. An examination revealed an antalgic gait, small effusion of the left knee with some tenderness of the bilateral joint lines, swelling in the right ankle with normal function, and slight tenderness and swelling of the Achilles tendon. Again, Dr. Rippy diagnosed knee and ankle joint pain. She ordered x-rays of the left knee and right ankle and prescribed Mobic and Tramadol. X-rays showed minimal degenerative changes in the left knee, and a normal right ankle. (Tr. 480)

Plaintiff did not seek out additional treatment for her physical complaints until August 1, 2013, at which time she was treated in the Emergency Room for pneumonia. (Tr. 597-598) She returned to Dr. Rippy's office on August 30, 2013, complaining of a "massive" headache of four days duration; pain in her hands, feet, wrists, and ankles; and, pain under her right breast that radiated into her back and right shoulder. An examination revealed expiratory wheezing, rhonchi, and crackles in the right mid lung field. Dr. Rippy diagnosed acute bronchitis and polyarticular

joint pain. She prescribed Bactrim, Meloxicam, Mucinex, Tylenol, Motrin, and advised the Plaintiff to increase her fluid intake.

Five months later, on January 23, 2014, Dr. Rippy treated the Plaintiff for worsening neck and back pain extending from the cervical to the thoracic spine, as well as right sided neck and shoulder pain and frequent headaches. Plaintiff indicated that Flexeril helped, but it made her drowsy. Dr. Rippy documented a normal gait with muscle spasm and tenderness on palpation of the back. She found no abnormalities in the shoulders. Dr. Rippy diagnosed lumbago, and prescribed Strattera, Meloxicam, Flexeril, Ibuprofen, and Robaxin.

On March 13, 2014, Plaintiff complained of right ankle, knee, middle and upper back, and right shoulder pain. (Tr. 594-595) Plaintiff felt that the tension in her back was causing her headaches, and she voiced an interest in trying injections. An exam revealed a full range of motion in the shoulder and a normal stance and gait. Dr. Rippy prescribed Robaxin, Fluoxetine, Anusol, HC, and DuoNeb. She also administered trigger point injections into the right trapezius and bilateral thoracic paraspinous muscles.

Plaintiff returned on June 16, 2014, reporting daily pain, stiffness, and swelling in her knee. (Tr. 593-594) She admitted that Ibuprofen helped, but indicated she was taking it frequently. Although she reported some continued stiffness, Plaintiff acknowledged significant improvement in her neck pain following the trigger point injections. Dr. Rippy diagnosed her with chronic obstructive pulmonary disease, knee joint pain, chronic hepatitis C, and a skin condition. She ordered labs and a CT scan of Plaintiff's thoracic spine, and referred her to a dermatologist.

On July 10, 2014, Dr. Stephen Heim, an orthopedist, treated Plaintiff for bilateral knee pain. (Tr. 581-583) There was crepitus in both knees, but she could fully extend and flex bilaterally. She also exhibited tenderness on the medial joint line with minimal degenerative

changes noted on x-ray. Suspecting a congenital meniscal problem, Dr. Heim ordered and MRI. The MRI confirmed a somewhat irregular tear of the body and posterior horn of the medial meniscus extending to the tibial articular surface. (Tr. 586)

On July 15, 2014, Plaintiff underwent a second physical CE with Dr. Westbrook. (Tr. 567-572) The examination revealed limited cervical rotation and an 80 percent normal grip strength bilaterally, but was otherwise normal. Plaintiff could hold a pen, write, squat, and arise from squatting position, although both resulted in pain. Dr. Westbrook diagnosed neck pain, substance abuse, knee pain, and hepatitis C and assessed only "mild limitations."

On July 24, 2014, Dr. Heim noted that the Plaintiff had not responded to conservative treatment and scheduled an arthroscopy. (Tr. 578-580) Seven days later, Plaintiff presented for a well woman's visit with complaints of neck pain. (Tr. 592-593) She indicated that the trigger point injections had resulted in pain relief for approximately three months. Ibuprofen and Flexeril were also somewhat helpful. Unfortunately, the pain and headaches had now returned. Plaintiff indicated that she was scheduled for knee surgery the following week. However, a physical exam revealed a normal range of motion in all of her extremities. Dr. Rippy diagnosed cervicalgia and ordered an MRI of her cervical spine. She also advised Plaintiff to continue the Ibuprofen, Flexeril, and Meloxicam. The MRI showed spondylitic ridging and degenerative changes of the cervical spine with foraminal spurs at multiple levels, a broad based central bulge or protrusion at the C5-6 level, Sebmarts's node type and superior end plate deformities, and a small paracentral disk bulge or protrusion on the right at the C7-T1 level. (Tr. 600)

In October, Dr. Brian Goodman, a pain specialist, noted tenderness to palpation of the cervical paraspinous muscle with limited flexion, extension, and rotation in the neck with pain. (Tr. 573-577) He diagnosed cervicalgia and cervical spondylosis. Dr. Goodman prescribed

medial branch facet injections at the C3-6 levels, physical therapy, and continued medication. However, he specifically stated that no activity restrictions were necessary.

### B.     Mental Impairments:

Plaintiff also carries the following mental diagnoses: recovering alcohol/drug abuse, attention deficit hyperactivity disorder, learning disorder in math and reading, major depressive disorder/dysthymic disorder, anxiety, posttraumatic stress disorder, and borderline personality disorder.

On September 2010, the Commissioner asked Dr. Steve Shry to complete a mental CE. (Tr. 193-198) Dr. Shry determined the Plaintiff was mildly impaired in her ability to attend and concentrate on tasks and cope with the typical mental demands of basic work-like tasks. He found no impairment in her ability to sustain persistence while completing tasks, complete work-like tasks within an acceptable time frame, or comprehend and carry out simple tasks.

Similarly, Dr. Nancy Toombs examined the Plaintiff in April 2011 and concluded that her social skills were somewhat underdeveloped, but she had the capacity to cope with the mental and cognitive demands of simple tasks, attend and concentrate without distraction, and persist. (Tr. 225-230)

Between January 2011 and December 2011, Plaintiff received regular mental health treatment at Western Arkansas Counseling and Guidance Center ("WACGC"). (Tr. 233-236, 237, 239, 242, 243, 244-249, 289, 290-291, 292-293, 294, 295, 297, 298) Records document overall improvement in her condition. Plaintiff sought out no treatment between December 2011 and November 2012, at which time she returned to WACGC for a diagnostic exam. (Tr. 486-488) In December 2012, Christina Couch noted a global assessment of functioning score ("GAF") of 60 and a full scale IQ of 91. (Tr. 506-509) Plaintiff returned to Dr. Alice Slavens for medication

management in February 2013. (Tr. 497-501) At that time, Plaintiff was in her second semester at Arkansas Tech University. She was taking no psychotropic medications, except Trazodone, but wanted medication. Attending school had made her more aware of her symptoms. Thus, Dr. Slavens prescribed Strattera. Later that month, her counselor, Lisa Little, indicated Plaintiff was doing well in all of her problem areas and maintaining well in school. (Tr. 489-492) In April, Dr. Slavens noted some continued depression that had responded to Prozac. (Tr. 517-519) Her anxiety had also improved, she was socializing with friends, her concentration and focus had improved with Strattera, and she was better able to handle stress.

In July, Plaintiff returned to Dr. Slavens reporting that her brother had recently died under suspicious circumstances. (Tr. 520-522) As a result, she had placed her education on hold. Dr. Slavens noted some situational depression and stress, but found her medication to be effective at treating her symptoms and she concluded no medication changes or adjustments were necessary. Dr. Slavens indicated that Plaintiff's situational issues would be addressed in therapy. The following month, Plaintiff stated that she was starting to "chill out" about her brother and would be returning to school the following week. (Tr. 523-525) The Strattera was working and she was "pretty focused." Again, Dr. Slavens noted that her medications were effective.

In October 2013, the Plaintiff had not returned to school, but planned to speak to her counselor about returning. (Tr. 526-528) A note indicates that both the therapist and staff were concerned about possible drug use. A urine drug screen was performed, and the Plaintiff admitted to alcohol and marijuana use. Dr. Slavens found Plaintiff to be non-compliant with treatment. .When she returned in December, the Plaintiff reported working around her apartment complex, helping with unit upkeep. (Tr. 529-531) She was medication compliant and her medications were moderately effective in treating her symptoms. Again, Plaintiff complained of some situational

9

depression associated with the terminal illness of a close friend and the reopening of her brother's cause of death.

In January 2014, Plaintiff resumed counseling with Ms. Little. (Tr. 493-496) The following month, Dr. Slavens again noted grief related stress. (Tr. 502-504) However, her mood was "pretty good overall." In March, she also reported improvement. (Tr. 532-534) Dr. Slavens indicated that her medications were effective with no side effects. The one-year anniversary of her brother's death in June 2014 and a recent eviction from her apartment (possibly related to possession of marijuana) brought more situational depression and anxiety. (Tr. 535-537) In spite of this, Dr. Slavens noted that her medications were moderately effective and her attention and concentration were fine.

In January 2015, Dr. Robert Spray conducted a consultative exam. (Tr. 617-622) He assessed moderate to severe difficulty with attention and concentration, a limited ability to persist, and difficulty comprehending work-like tasks in a timely fashion. However, Dr. Spray also found the Plaintiff had the capacity to interact socially.

**IV.　Discussion:**

Plaintiff raises four issues on appeal: (1) the ALJ's failure to develop the record; (2) the ALJ's credibility analysis; (3) the ALJ's RFC determination; and, (4) the ALJ's treatment of Dr. Rippy's Attending Physician's Statement. (ECF No. 13)

**　　A.　Development of the Record:**

Plaintiff seeks reversal, arguing that the ALJ did not fully develop the record by seeking further clarification regarding the severity of her impairments. She makes a blanket assertion that her true work-related restrictions are not evident from the record. We disagree.

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ is not required, however, to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Here, we find that the ALJ fully developed the record. It contains all of the medical evidence from Plaintiff's treating providers, two physical CEs, several mental CEs, and opinions from non-examining agency consultants. (Tr. 193-198, 201-249, 253-305, 322-323, 479-622) Accordingly, we find that the record contains adequate evidence upon which an informed decision could be based.

Further, although Plaintiff argues the ALJ should have recontacted Dr. Rippy or ordered additional CEs, she has failed to establish that doing so would have ultimately changed the outcome of this case. *See Byes v. Astrue,* 687 F.3d 913, 917–18 (8th Cir. 2012) (recognizing the doctrine of harmless-error in Social Security cases).

Interestingly, at the most recent administrative hearing, the ALJ informed both Plaintiff and her counsel that he felt the record was fully developed. (Tr. 360). Plaintiff offered no objection and failed to request additional CEs at that time. (Tr. 360-361) While we realize that issue preclusion is not applicable at this level of review, we do believe that her failure to object or at

least request additional CEs is a factor to be considered, as it suggests she agreed with the ALJ's determination.

Therefore, we find that the Plaintiff has failed to establish the harm necessary for this Court to remand the matter for further consideration.

**B.  Credibility Analysis:**

Plaintiff also asserts that the ALJ failed to conduct a proper credibility assessment. More specifically, she insists that the ALJ erred by failing to consider the side effects of her medications and to provide solid, substantiated reasons for discrediting her testimony. The ALJ is required to consider all of the evidence relating to Plaintiff's subject complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) function restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians. *Polaski*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them. *Id*. However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (*citing Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted). The Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Contrary to Plaintiff's argument, the ALJ pointed out numerous factors that weigh against her credibility. Though probably not exhaustive, the following is a list of the most significant factors that undermine the Plaintiff's subjective complaints:

12

  (1)　Plaintiff sought out only conservative treatment for her alleged impairments. Although she was administered one epidural steroid injection that brought some short-term pain relief, Plaintiff cancelled the arthroscopy of her knee. Further, she failed to reschedule the procedure and did not undergo medial nerve blocks or physical therapy as prescribed by Dr. Brian Goodman. (Tr. 573-577, 591-592) *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (a failure to follow a recommended course of treatment weighs against credibility).

  (2)　Plaintiff failed to pursue regular treatment for her complaints. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). As previously noted, she sought out no treatment whatsoever between August 2010 and January 2011. Further, she did not obtain any treatment for her physical complaints between September 2011 and July 2013; September 2013 and January 2014; and, July 2014 and October 2014. Similarly, Plaintiff received no mental health treatment from December 2011 through November 2012. These inconsistencies call her credibility into question.

  (3)　Plaintiff's activities of daily living were said to include preparing simple meals, doing laundry, washing dishes, going out alone, shopping in stores for food and necessities, handling her personal finances, watching television, reading, attending church twice per week, and going to the library weekly for approximately one hour. (Tr. 47-48, 156-163)

  (4)　Plaintiff's work history is fraught with jobs lasting no more than a few months. In fact, she testified that her longest job lasted one to two months. (Tr. 40) *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) (discussing an ALJ decision where the claimant's "work history suggested poor motivation and called his disability claim into question").

  (5)　Although Plaintiff claims mental symptoms dating back to 1989, she admitted to having had no treatment for a mental diagnosis prior to January 2011, when she began treatment at Western Arkansas Counseling and Guidance Center. (Tr. 193-198, 233-236) We note this date is also five months after she filed her application for benefits. (Tr. 114-119)

  (6)　Plaintiff was able to attend college during the relevant time and maintained well until her brother's death in the summer 2013. (Tr. 489-492, 493-501, 520, 526-528, 618)

  (7)　Plaintiff performed some work activity during the relevant period, although it did not rise to the level of substantial gainful activity. (Tr. 16, 517-519) *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005) (working after the onset of an impairment is some evidence of an ability to work).

(8)  Plaintiff contends she tends to isolate and withdraw from others, yet records reveal that she was attending college, socializing with friends, attending church, helping the elderly, and working at least part-time. (Tr. 489, 491, 502-505, 518)

(9)  Plaintiff's mental impairments and neck pain were amenable to treatment as is evidenced by multiple records from Western Arkansas Counseling and Guidance Center noting "some" to "good" progress in achieving her treatment goals and significant improvement in her neck pain following epidural steroid injections. (Tr. 489-492, 517-519, 523-537, 544-550, 558-564, 593-594) *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).

(10)  Aside from one mention of drowsiness associated with the Flexeril (Tr. 595-596) and stomach upset caused by Meloxicam (Tr. 591-592), Plaintiff consistently reported no medication side effects. (Tr. 517-519, 523-537)

### C.   RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945. A disability claimant has the burden of establishing his or her RFC. *Vossen v. Astrue,* 612 F.3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

After reviewing the evidence, the undersigned finds that the ALJ's RFC assessment is supported by substantial evidence. Plaintiff can perform light work with occasional overhead reaching bilaterally, climbing, balancing, crawling, kneeling, crouching, feeling, fingering, and

handling bilaterally; where the work consists of simple, routine, and repetitive tasks in a setting where interpersonal contact is incidental to the work performed, the supervision is simple, direct, and concrete; and, where the work does not require the Plaintiff to work around the general public.

As previously noted, the Plaintiff sought out no treatment whatsoever between her onset date and January 2011. In January 2011, she began treatment at WACGC wherein her treatment providers consistently documented improvement with treatment. Aside from the death of her brother, the terminal illness and ultimate death of her close friend, and her eviction from her apartment, all situational in nature, Dr. Slavens noted that her impairments were fairly well controlled and the prescribed medications effective. Plaintiff's ability to attend college and work, albeit it part-time, during the relevant time period lends further support to the effectiveness of her medications. Although she did ultimately drop out of college and lose her job, these actions were the result of situational triggers and unrelated to her impairments.

While we do note Dr. Spray's assessment of moderate to severe impairment in attention and concentration, a limited ability to persist, and difficulty comprehending work-like tasks in a timely fashion, the overall record does not support these limitations. Instead, Plaintiff's treating physician, Dr. Slavens, documented consistent improvement with medication. Her only set backs were situational in nature. As such, we do not believe the ALJ was obligated to give Dr. Spray's assessment controlling weight. Moreover, we find the record supports the mental limitations identified by the ALJ.

Likewise, we find that the medical evidence of record supports the physical limitations determined by the ALJ. It is clear that the Plaintiff complained of neck, back, left knee, and right ankle pain. An MRI of the left knee ultimately confirmed a meniscus tear. Plaintiff testified that steroid injections into her knee brought symptom relief for approximately one month. Further,

while it is true that Dr. Heim scheduled surgery to correct Plaintiff's meniscal tear, we note that she cancelled her surgery and never rescheduled it.

An MRI of her cervical spine revealed left ridging at the C3-4 level, diffuse mild to moderate disk bulges at the C4-5, C5-6, C6-7, and C7-T1 levels, bilateral foraminal spurring at the C4-5 and C5-6 levels, and a right protrusion at the C6-7 and C7-T1 levels. Trigger point injections appeared to have been successful, at least for the short-term, reducing her back and neck pain. In 2014, Dr. Goodman prescribed medial branch injections at the C3, C4, C5, and C6 levels and physical therapy, but we can find no evidence to indicate that she participated in either of the prescribed treatments. However, probably the most damaging is Dr. Goodman's indication that no activity restrictions were necessary.

Dr. Rippy did complete a medical source statement, but for the reasons identified below, we do not find support for her assessment in the record. Instead, the evidence suggests that the Plaintiff's pain was not as severe as alleged. Accordingly, we believe the record provides substantial support for the ALJ's assessment of light work with the non-exertional limitations as set forth in his opinion.

### D. Attending Physician's Statement:

While treating physician's RFC opinions are entitled to deference, they do not automatically control, *see Perkins v. Astrue*, 648 F.3d 892, 897-98 (8th Cir. 2011); and, a physician's opinion may be discounted when it is based largely on a claimant's own subjective reports of symptoms and limitations, *see McDade v. Astrue*, 720 F.3d 994, 999-1000 (8th Cir. 2013). Thus, to determine whether a treating physician's opinion should control, "[t]he record must be evaluated as a whole." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

In the present case, Dr. Kelli Rippy, a general practitioner, has treated Plaintiff since June 20, 2011, for joint pain, arthritis, depression, anxiety, tension headaches resulting from anxiety, and hepatitis C. (Tr. 308-310) On January 18, 2012, Dr. Rippy completed a Medical Source Statement. She found that Plaintiff's impairments resulted in a moderate degree of pain that would interfere with the Plaintiff's ability to pay attention and concentrate, as well as tolerate work stress. Further, Dr. Rippy was of the opinion that the Plaintiff's impairments would result in the following limitations:

- Can sit for a total of 6 hours per 8-hour day, 1 hour uninterrupted
- Can stand for 1 hour total per 8-hour day, 30 minutes uninterrupted
- Can walk for 1 hour total per 8-hour day, 1 hour uninterrupted
- Cannot use hands for reaching or pushing/pulling in a competitive environment
- Cannot crawl
- Can occasionally bend, squat, climb, reach above head, stoop, crouch, and kneel
- Can occasionally tolerate exposure to dust, fumes, gasses, and noise
- Claimant will sometimes need to take unscheduled breaks during an 8 hour working shift
- Claimant will need a sit/stand/walk option if employed
- Claimant can rarely look up and occasionally look down, turn head right or left, or hold head in a static position

The ALJ gave Dr. Rippy's assessment little weight because it was inconsistent with the otherwise credible medical evidence of record. At the time of her assessment, Dr. Rippy was aware of the x-ray results showing only minimal changes in one knee. Further, she had treated the Plaintiff on only two occasions prior to completing her Medical Source Statement.

After reviewing the evidence, we find that the ALJ's decision to give Dr. Rippy's assessment little weight was well within his discretion. The record does contain some objective evidence to support the Plaintiff's allegations of pain; however, as found by Dr. Westbrook, Plaintiff's limitations were mild at best. The evidence also shows that her condition was responsive to treatment via medication and trigger point injections. While we do note Dr. Heim scheduled Plaintiff to undergo an arthroscopy of her knee, Plaintiff cancelled the surgery and failed to

reschedule it. Further, there are no records to indicate that she underwent injections or participated in PT, as prescribed by Dr. Goodman. We also note Dr. Goodman's assessment that no activity restrictions were necessary. Thus, while we do agree that the Plaintiff's pain produces some work-related limitations, we do not believe they exceed the limitations contained in the ALJ's RFC assessment.

**V.      Conclusion:**

Based on the foregoing, we recommend affirming the decision of the ALJ and dismissing the Plaintiff's Complaint.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 23rd day of June, 2016.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

18